# United States Court of Appeals
## For the First Circuit

---

No. 99-1688

TEAMSTERS LOCAL UNION NO. 42,

Plaintiff, Appellant,

v.

SUPERVALU, INC.,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

---

Before

Torruella, Chief Judge,

Selya and Lipez, Circuit Judges.

---

John D. Burke, with whom Law Offices of Gabriel Dumont was on brief, for appellant.
Keith P. Spiller, with whom Thompson Hine & Flory LLP, Gregory C. Keating, and Choate, Hall & Stewart were on brief, for appellee.

---

May 15, 2000

---

**SELYA, Circuit Judge.** Arbitral awards are nearly impervious to judicial oversight. See Advest, Inc. v. McCarthy, 914 F.2d 6, 8-9 (1st Cir. 1990) (describing exceptions); Maine Cent. R.R. Co. v. Brotherhood of Maintenance of Way Employees, 873 F.2d 425, 428 (1st Cir. 1989) ("Judicial review of an arbitration award is among the narrowest known in the law."). Accordingly, disputes that are committed by contract to the arbitral process almost always are won or lost before the arbitrator. Successful court challenges are few and far between.

Undaunted by this bleak prospect, Local Union No. 42 (Local 42 or the union), a Teamsters affiliate, invited a federal district court to vacate a labor arbitrator's award in favor of Supervalu, Inc. (Supervalu or the employer). The court refused the invitation. Because we agree that the arbitrator, regardless of whether his decision was right or wrong, acted within the realm of the authority vested in him by the applicable collective bargaining agreement, we affirm.

## I. BACKGROUND

Supervalu is a large wholesale grocer that operates a regional facility in Andover, Massachusetts. Local 42 represents all the warehouse workers and truck drivers at that site. The parties' current collective bargaining agreement (the

CBA) took effect in May of 1994. Among other things, the CBA designates Local 42 as the exclusive bargaining agent for its members, lays out wage rates for the multi-year period covered by the pact (distinguishing, in the process, between "present" and "new" full-time employees), and sets out guidelines for the allocation of benefits.

About two months before the CBA took effect, Supervalu acquired the business of a competitor, Sweet Life Foods (SLF), which operated a grocery warehouse in Northboro, Massachusetts. As part of that transaction, Supervalu assumed the collective bargaining agreement then in effect between SLF and Teamsters Local 170 (which represented workers at the Northboro facility). Supervalu soon decided to move all the Northboro work to Andover, transferring some of the crew and discharging the rest. To that end, it commenced negotiations with Local 170 anent transfer and severance terms, but failed to reach an accord.

In August of 1994, Supervalu made a so-called "final and best offer" to Local 170 in the form of a memorandum that, among other things, laid out anticipated terms of engagement (including compensation) for those workers who would be redirected to Andover. Supervalu informed a representative of Local 42 about the proposal (or so the arbitrator supportably found), but it never bargained with Local 42 anent the terms and

conditions of the transferees' employment. In all events, neither Local 170 nor Local 42 ever formally accepted the offer. Supervalu, acting unilaterally, nonetheless started shifting workers from Northboro to Andover in late August and September. Upon reporting for duty at Andover, the transferees automatically became members of Local 42.

Supervalu applied the wage rate and conditions of employment specified in the memorandum to the transferred workers. Overall, these terms were a compromise between treating them like veteran employees and treating them like neophytes.[1] This hermaphroditic status sowed the seeds for an horrific harvest.

The first poisonous plant bloomed when the union, acting on the transferees' behalf, grieved the allocation of bonus days (i.e., extra personal days), charging that under Article 25 of the CBA the transferees' entitlement to bonus days should be determined in light of their years of service with

---

[1]To offer a few illustrations, the transferred workers were treated like experienced hands in that they were exempted from the 60-day probationary period for new hires imposed by Article 2 of the CBA and received credit toward vacation eligibility for the time they had worked with SLF. They were, however, paid less than veteran workers (although their starting wage — $13.23 per hour — was substantially above the minimum rate set for beginners in the CBA), and their eligibility for bonus days was calculated as if they had begun work on the date the CBA took effect.

SLF.  In mounting this challenge, the union brushed aside the CBA's definition of seniority as "the period of employment with [Supervalu] in the work covered by this Agreement, at the terminal (or terminals) within the jurisdiction of the Local," and posited that "years/service" — the critical integer in the bonus days equation — was a broader term that could include periods in the employ of SLF.  Supervalu rejected the grievance, asserting that years of service, like seniority, had to be calculated from  the date it hired an employee to work full time at Andover.

The parties submitted the case to arbitration.  The arbitrator, Greenbaum, observed that some workers who came to the Andover facility from acquired companies had been permitted to carry over years of service (as well as seniority).  She then determined that, from and after 1989, the terms "years/service" and "seniority" had developed distinct meanings.  Beginning at that time, the CBA made provision for "casual employees," i.e., part-time workers hired, as needed, to toil in the Andover warehouse, and those employees, collectively, had come to constitute the pool from which most new full-time workers were recruited.  Arbitrator Greenbaum noted that when a casual worker became a regular full-time employee, Supervalu figured his years of service from his original date of hire as a casual employee,

even though he accrued no seniority in respect to the time spent in casual work.

The arbitrator found additional support for the theory that years of service and seniority were independent variables in the differing uses of those terms within the four corners of the CBA:

> A review of [the terms'] uses in the Agreement shows that where the intent is to provide an employee with a benefit that is non-competitive, i.e., does not impact on any other employee, such as bonus days and entitlement to vacation days, the parties used the synonymous terms of date of hire or years of service or length of service or "the period of employment with the Company" and "in the Company's employ" all meaning essentially the same thing. In contrast, the term "seniority" is generally used where competitive rights are involved. This is the case in bidding for promotions, preferences for vacation schedules, preference for work assignments, . . . .

She also found that this dichotomy characterized the treatment of the transferees (at least to some degree), inasmuch as their vacation entitlement — a non-competitive benefit — was determined in light of the years they had worked at SLF, while preference in vacation scheduling — a competitive benefit — was allocated strictly in accordance with seniority.

Based on these facts, the arbitrator found that, as used in the CBA, "years/service" was broader than "seniority" and sometimes included work other than full-time Local 42 work

at the Andover warehouse; and that the transferees' previous service at SLF should have informed the calculation of their bonus days. The fact that the SLF transferees were not treated generically as new hires (unlike another group that had previously joined the work force from an acquired company) contributed heavily to her conclusion that Supervalu had breached the CBA in computing the transferees' entitlement to bonus days without regard to "years/service" (including time spent at SLF).[2]

The battleground then shifted to wages and, in particular, to Article 13 of the CBA (governing "minimum hourly wages"). Article 13 sets out separate wage schedules for "present" and "new" full-time workers, and lists wage rates for casual (part-time) workers in a separate chart. Both before and after the CBA took effect, Supervalu's prevailing practice was to pay former casual workers who became regular full-time employees at the rate specified by the controlling CBA for new

---

[2]Arbitrator Greenbaum found Supervalu's breach of the CBA especially flagrant because it had allowed transferees to receive bonus days as early as May 1995, even though they had not yet been working at Andover for a full year. In the arbitrator's words, "[t]he Company created a fiction for them by changing their date of hire from September or October 1994 to May 1994 [when the CBA had taken effect], which certainly was not in accordance with its agreement with Local 42." This approach both ignored the transferees' years of service at SLF and defied the CBA's rules anent new hires.

-7-

hires.  When Supervalu began to integrate SLF personnel into its Andover work force, it paid them at a rate of $13.23/hr. — one that fell somewhere between the rate for new recruits and the rates applicable to present workers.

Buoyed by Arbitrator Greenbaum's award, Local 42 filed a second grievance.  This time, it argued that the starting wages paid to erstwhile casual employees and SLF transferees were too stingy and placed Supervalu in breach of Article 13. The union asseverated that wages, like bonus days and vacation eligibility, were a non-competitive benefit and should be determined by years of service, not seniority, in accordance with Arbitrator Greenbaum's construct.  If this were so, the union's thesis ran, workers who had accumulated years of service could not properly be deemed "new," and Supervalu's praxis of paying them differently than "present" employees transgressed the CBA because Article 13 contained no classification for full-time workers other than "new" and "present."

This second grievance was heard by Arbitrator Cooper. He adopted Arbitrator Greenbaum's extensive findings of fact and acknowledged that Local 42 had never agreed to a specific wage scale for the transferees.  The question for the transferees, then, was whether the wages unilaterally imposed by the employer breached the CBA.  Noting that Article 13's wage-rate provision

-8-

did not state whether the wage progression limned thereby was to be based upon "seniority" or "years/service," Arbitrator Cooper concluded that the article was thus ambiguous as to whether the transferees and former casual employees — who had accrued years of service but no seniority — were to be regarded as "new" or "present" workers for purposes germane to this article. The arbitrator proceeded to explore the perceived ambiguity.

He first examined the historical development of the wage provisions. Doing so revealed to his satisfaction that paying former casual workers as "present" workers (i.e., according to their original dates of hire) would create some obvious anomalies. For example, the CBA dictated that "all new, full time employees" would reach the top rate in their classification after seven years, but, on the union's interpretation, some casual workers would receive the top rate simultaneous with their engagement as regular full-time employees, leapfrogging more senior members of Local 42 in the process.[3] The arbitrator expressed grave doubt that the parties

_____

[3]This would create a stark inequity in regard to workers who had been recalled after forced layoffs. When reinstated, such workers are paid at the rates they were earning when furloughed, not at the current rates for "present" workers. They are nonetheless entitled, under Article 27 of the CBA, to a preference over casual workers when positions open up.

intended the CBA to produce such eccentric results "without a single word in the [text]."

Arbitrator Cooper also found that longstanding practice suggested that the parties "did not consider [a casual employee's] date of hire as the point for measuring his or her progression on the salary scale." In this vein, he observed that the employer had paid former casual workers who became regular full-time workers at the rate for "new" hires ever since the casual employee category had been established in 1989. Coupling this evidence of prior practice with the language of the CBA, Arbitrator Cooper concluded that Supervalu had not contravened the intention behind Article 13 by paying former casual employees according to the schedule for new hires.[4]

Arbitrator Cooper then turned to the issue of whether the wages paid to workers transferring from SLF should have been based on years of service or seniority. He found that his resolution of the earlier question — involving the entry-level rate for former casual employees who converted to full-time status — was decisive:

_____

[4]This aspect of the arbitral award is not before us. Although the union's complaint prayed for vacation of the entire award, its arguments before this court have dealt exclusively with the rates paid to transferees. We limit our analysis accordingly and deem forfeited all arguments about the wages for former casual employees. See Sheinkopf v. Stone, 927 F.2d 1259, 1263 (1st Cir. 1991).

> Unless there is some compelling aspect of Article 13 which demonstrates that notwithstanding the narrow definition of "seniority," wages were to be determined by time in service including time spent with the Company at the former Sweet Life facility, the Union does not have a valid contractual claim. Arbitrator Greenbaum relied upon the fact that for employees who served as casual employees and later became regular full-time employees, the Company counted their service time from their initial date of hire, not their seniority date, to measure their entitlement to bonus days. The opposite is true in the current case, the Company never counted from the date of hire to determine the appropriate wage rate for casual employees. Given this circumstance, Arbitrator Greenbaum's Award requires a different outcome.

Thus, Supervalu had not violated Article 13 of the CBA by declining to pay SLF transferees the wages guaranteed to "present" employees.

In resolving the second grievance favorably to the employer, the arbitrator gave short shrift to the union's claim that Supervalu was in breach because it had paid the transferred workers more than the wages stipulated in Article 13 for "new" employees. In his view, Article 13 established "only a minimum wage rate and therefore if the Company seeks to pay the employees more than is required, it is permitted to do so." He bolstered this finding by noting the transferees' acquiescence in the rates paid and concluding that "the general acquiescence by the employees involved should be inferred to the Union."

-11-

Displeased with Arbitrator Cooper's award, Local 42 filed suit for vacation in the federal district court. See 29 U.S.C. § 185. After weighing cross-motions for summary judgment, the court determined that the union's jeremiad amounted to no more than a litany of factual and legal errors allegedly made by the arbitrator, and concluded that it lacked authority to intercede. Consequently, it granted brevis disposition in Supervalu's favor. This appeal ensued.

## II.  STANDARD OF REVIEW

In an action to vacate an arbitral award, this court reviews the district court's grant of summary judgment de novo, applying the same standard as did that tribunal. See Wheelabrator Envirotech Operating Servs. Inc. v. Massachusetts Laborers Dist. Council Local 1144, 88 F.3d 40, 43 (1st Cir. 1996). In this type of case, the district court's authority (and, hence, our authority) is very tightly circumscribed:

> The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. . . . As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate.

United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36 (1987) (quoting United Steelworkers v. Enterprise Wheel & Car

-12-

Corp., 363 U.S. 593, 597 (1960)).  This standard has been described in different ways over time.  See Advest, 914 F.2d at 9 (citing examples).  Whatever words are used, however, all the formulations reflect the idea that a court ought not to vacate an arbitral award "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority."  Misco, 484 U.S. at 38; see also Labor Relations Div. of Constr. Indus. v. Int'l Bhd. of Teamsters, Local #379, 29 F.3d 742, 743 (1st Cir. 1994) (concluding that "courts must resist the temptation to substitute their own judgment about the most reasonable meaning of a labor contract for that of the arbitrator and avoid the tendency to strike down even an arbitrator's erroneous interpretation of such contracts").

In a case in which the arbitrator purports to interpret the language of a collective bargaining agreement, a party who seeks judicial review ordinarily must demonstrate that the award is contrary to the plain language of the CBA and that the arbitrator, heedless of the contract language, preferred instead to write his own prescription for industrial justice. See Kraft Foods, Inc. v. Office & Prof'l Employees Int'l Union, Local 1295, 203 F.3d 98, 100 (1st Cir. 2000); Challenger Caribbean Corp. v. Union General de Trabajadores, 903 F.2d 857, 861 (1st

-13-

Cir. 1990).  Put another way, a successful challenge to an arbitral award in such circumstances necessitates a showing that the award is "(1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact."  Local 1445, United Food and Commercial Workers Int'l Union v. Stop & Shop Cos., 776 F.2d 19, 21 (1st Cir. 1985).

## III.  ANALYSIS

Local 42 maintains that Arbitrator Cooper committed four fundamental mistakes.  First, the union asserts that the arbitrator impermissibly relied upon the transferees' acquiescence in regard to their wage rate (reliance which, in the union's view, contradicts the union's status as the transferees' exclusive bargaining representative in respect to wages).  Second, the union contends that, whereas Article 13 created only two classifications of regular full-time employees, the arbitrator took it upon himself to rewrite the agreement and construct another category.  Third, the union charges that the arbitrator departed from his proper province when he allowed Supervalu to pay the transferees more than the minimum hourly wage for new workers specified in the CBA.  Finally, the union

-14-

raises a claim of procedural error.  We find none of these four arguments persuasive.

## A

Local 42 calumnizes the arbitrator's comment that "[w]hile the Union did not agree to [the transferees'] wage rate, the general acquiescence by the employees involved should be inferred to the Union."  The union claims that acquiescence is irrelevant, and that the arbitrator's reliance on it effectively rewrote the CBA and frustrated the union's prerogative as the exclusive negotiating agent for all the employees in the bargaining unit (including those who transferred from SLF).  As a subset of this argument, the union claims that glorifying the effect of acquiescence inserted into the CBA a brand-new timeliness requirement for union grievances.

This argument is a red herring.  We do not agree with the union that Arbitrator Cooper premised his award on acquiescence.  As the passage quoted supra at 10 makes manifest, the arbitrator understandably determined that "new," as used in Article 13, must mean "without seniority" in order to make sense of the overall payment scheme vis-à-vis former casual employees. Based on this determination — one which the union does not challenge, see supra note 4 — he then concluded that the transferees (whom the union concedes had no seniority) likewise

-15-

must be deemed "new" employees for purposes of the wage provision.[5] This reasoning depended on the contract language and the arbitrator's discernment of the parties' mutual intent. It did not "ignore the plain language of the contract," Misco, 484 U.S. at 38, because "new" plausibly could mean "new to Local 42 and the Andover warehouse." Nor did it depend in any way, shape, or form on a finding of acquiescence.

We hasten to add that Arbitrator Cooper's rendition of the wage provision seems reasonable — especially since the parties knew, when the CBA was signed, that the category of "new" employees under the previous CBA had been deemed to include former casual employees for wage purposes. Indeed, the only way to avoid the conclusion that he reached (after deciding that "new" meant "without seniority") would have been to decide that "new" had different meanings for different categories of workers. We cannot fault the arbitrator for his reluctance to engage in that type of linguistic microsurgery. In all events, what counts is that the arbitrator's reading of the wage

---

[5]Arbitrator Cooper was not precluded from reaching this result by Arbitrator Greenbaum's conclusion that the parties typically used years of service to quantify non-competitive benefits. Earlier holdings of a previous arbitrator do not bind a new arbitrator to read a collective bargaining agreement in a way that he determines is contrary to the parties' intent. See Boston Shipping Ass'n v. International Longshoremen's Ass'n, 659 F.2d 1, 3 n.4 (1st Cir. 1981).

provision, right or wrong, had a plausible basis in the language and structure of the CBA. A reviewing court can go no further. See Coastal Oil of New Engl., Inc. v. Teamsters Local A/W, 134 F.3d 466, 469 (1st Cir. 1998); Challenger Caribbean, 903 F.2d at 863-64.

If more were needed — and we doubt that it is — we note that Local 42 wrests the arbitrator's statements about acquiescence from their contextual moorings, thus distorting their meaning. Placing the remarks in context clarifies their possible role in the decisional calculus.[6] Toward the beginning of Arbitrator Cooper's discussion, he wrote that "[o]nce the facts are determined, an arbitrator's first step is to look at the parties' Agreement and, if the clear and unambiguous language of that Agreement does not answer the question posed, the parties' conduct should be used to help decipher their intent." He then seems to have used the transferees' acquiescence (and that of Local 42) to cast light upon the parties' initial understanding that the transferees' wage rate was acceptable. That understanding — as the arbitrator suggested in the very next sentence — could reflect that the

--------

[6]Neither the arbitrator's factual finding of acquiescence nor his legal determination that acquiescence could be imputed to the union are susceptible to review in this proceeding. See Misco, 484 U.S. at 36, 38.

union knew all along that the CBA established a minimum wage rate and thus permitted the employer to pay more than the minimum if it so desired. Applying this original understanding to what was done vis-à-vis the transferees lends support to his holding.

To be sure, the arbitrator's decision is not entirely a model either of consistency or clarity. But we do not review arbitral decisions for style points, and the arbitrator's core message — that the CBA, as drafted, permitted the employer unilaterally to pay classes of employees more (but not less) than the agreed minimum wage — comes through with sufficient precision. To cinch matters, although rational minds can differ about whether the arbitrator accurately divined the parties' intent, the standard of review does not allow an inquiring court to second-guess the correctness of that determination. See Enterprise Wheel, 363 U.S. at 599; Labor Relations Div., 29 F.3d at 745. Nor does the arbitrator's use of acquiescence as relevant evidence open the award to judicial nullification. Even if his usage is susceptible to the union's charge that he impermissibly read a timeliness provision into the CBA, "[a] mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his

authority, is not a reason for refusing to enforce the award."
Enterprise Wheel, 363 U.S. at 598.

We add a postscript of sorts. An arbitrator has no duty to set forth the reasons underlying his award. Consequently, a reviewing court may "uphold[] the arbitrator's decision on grounds or reasoning not employed by the arbitrator himself." Labor Relations Div., 29 F.3d at 747. For that reason, we see no problem in approving the instant decision based on the arbitrator's plausible construction of the terms "new" and "minimum hourly wages," without more.

## B

This brings us to Local 42's contention that Arbitrator Cooper arbitrarily engrafted a hybrid category of regular full-time workers — transferees — onto Article 13. This contention, too, stems from an insensitive reading of the arbitrator's decision. We explain briefly.

The arbitrator's award, whether or not mistaken, resulted directly from his interpretation of two terms set forth in Article 13 of the CBA ("new" and "minimum hourly wages"). On that basis, he determined that the employer was entitled as a matter of contract to pay more (but not less) than the rates listed as "minimum hourly wages." This determination did not create a third category of full-time employees. Rather, under

-19-

the arbitrator's plausible construction, the transferees were members of the CBA's new-worker category who were being paid more than the minimum wage, as the CBA permitted.[7]  Viewed in this light, the arbitral decision did not amend the CBA, but, rather, derived its essence from the CBA.  No more is exigible.[8] See Misco, 484 U.S. at 36; Kraft Foods, 203 F.3d at 102, 103.

## C

Local 42 makes a last-ditch assertion that the arbitrator exceeded his authority because "[n]othing in the [CBA] provided Supervalu with the right to pay more than the contractually stated terms without Local 42's agreement."  In its estimation, the CBA is not a "minimum standards contract," and thus deprives the employer of the freedom to pay more than the stipulated wages.  This is the same whine — a protest against the arbitrator's construction of the term "minimum

---

[7]We note in passing that, for much the same reason, the higher wages did not contravene Article 9(C) (which barred "attempt[s] to arrange other conditions [of employment] with any of its employees than are set forth in this Agreement").

[8]Although the workers who had been transferred from SLF did not comprise a third category of regular full-time employees within the meaning of Article 13 of the CBA, the separate definitions of "years/service" and "seniority" described by Arbitrator Greenbaum plainly allowed for three classes of full-time workers overall, namely, workers with years of service and seniority; workers with neither years of service nor seniority; and workers with years of service but no seniority.  This taxonomy does no violence to the CBA — and it was the union that urged the taxonomy on Arbitrator Greenbaum in the first place.

hourly wages" — in a new bottle, and it is equally unpalatable. See Misco, 484 U.S. at 38. Put another way, to the extent that the arbitral award properly can be characterized as embodying a conclusion that the CBA functioned like a minimum standards contract, that is a legal conclusion which falls outside the narrow confines of judicial review. See id. Moreover, there is no sign that Local 42 ever argued this point to the arbitrator, and it is therefore procedurally defaulted. See Dorado Beach Hotel Corp. v. Union de Trabajadores de la Industria Gastronomica Local 610, 959 F.2d 2, 5-6 (1st Cir. 1992).

The related argument that federal law requires employers to negotiate wages with union representatives, see 29 U.S.C. § 159(a), also comes too late in the day. The union's contention before the arbitrator was simply that "the Company is in violation of Article 13 of the collective bargaining agreement between the parties." The statutory argument was, therefore, waived.

At any rate, because arbitrators acquire their power from the parties' agreement to submit to their decisions, they generally lack the authority, absent a contrary stipulation, to consider laws external to the CBA. See Barrentine v. Arkansas-Best Freight Sys. Inc., 450 U.S. 728, 744 & n.23 (1981); Challenger Caribbean, 903 F.2d at 866. That being so, we cannot

take the arbitrator to task for concentrating on the CBA's language and not on federal labor law. See Graphic Arts Int'l Union Local 97B v. Haddon Craftsmen, Inc., 796 F.2d 692, 697-98 (3d Cir. 1986); cf. Alexander v. Gardner-Denver Co., 415 U.S. 36, 49-50 (1974) (explaining that contractual rights under a CBA and statutory rights are "distinctly separate" and may be enforced "in their respectively appropriate forums" without inconsistency).

The authorities cited by the union do not convince us otherwise. In Leed Architectural Products, Inc. v. United Steelworkers of America, Local 6674, 916 F.2d 63 (2d Cir. 1990), the court affirmed the vacatur of an arbitral award that required an employer to pay aggrieved workers the same wage that it had agreed to pay a new employee. In that case, however, the CBA specified a maximum as well as a minimum wage, and the awarded rate of pay exceeded the cap. See id. at 64. Here, the CBA only sets forth a minimum, and the wage rate paid to the transferees (and sanctioned by the arbitrator) is not inconsistent with it.

The arbitral decisions cited by Local 42 are beside any relevant point. While they suggest that Arbitrator Cooper interpreted the CBA differently than other arbitrators in kindred situations, that suggestion misses the mark. Because

-22-

"an arbitrator's refusal to follow a previous arbitrator's interpretation of a specific contractual provision does not expose an ensuing award to judicial tinkering," El Dorado Technical Servs., Inc. v. Union General de Trabajadores, 961 F.2d 317, 321 (1st Cir. 1992), these citations afford the union no traction.

## D

Local 42's procedural argument need not detain us. It complains that, at the arbitration hearing, the arbitrator denied its representative the opportunity to present evidence. We have perused the record with care and find that the arbitrator merely declined to hear the witness's elucidation of the contents of certain items of documentary evidence. Thus, the union's claim of error fails.

Generally speaking, documents are the best evidence of their contents. See, e.g., Fed. R. Evid. 1002. Consequently, an arbitrator, like a trial judge, usually acts within his rights in admitting documents into evidence without permitting external elaboration. Nothing about this case removes it from the sweep of this general rule. We add only that any error in this regard would have been benign; the union had ample

opportunity to explain the significance of the documents in its post-hearing brief and took full advantage.

**IV. CONCLUSION**

We need go no further. The arbitral award at issue here stemmed rationally, if not inevitably, from the arbitrator's construction of the CBA. It is founded in reasoning that can be questioned, but not dismissed as chimerical. It does not depend on invented or imagined facts. Because this is so, and because the union's claim of procedural error is jejune, the award must stand. When all is said and done, "courts must confine themselves to determining whether the arbitrator's construction of the contract was in any way plausible," Labor Relations Div., 29 F.3d at 743, and the decision here passes that undemanding test.

**Affirmed**.