**SHAW'S SUPERMARKETS,**
**INC., Plaintiff,**

v.

**UNITED FOOD AND COMMERCIAL**
**WORKERS UNION, Local 791**
**AFL–CIO, Defendant.**

**C.A. No. 02–98L.**

United States District Court,
D. Rhode Island.

June 23, 2003.

Gordon P. Cleary, Vetter & White, Incorporated, Providence, RI, Nancy A. McGuire, Esq., Nutter, McClennen & Fish, LLP, Boston, MA, for plaintiff.

James T. McCormick, McKenna & McCormick, Providence, RI, Warren H. Pyle, Betsy L. Ehrenberg, Esq., Pyle, Rome, Lichten & Ehrenberg, P.C., Boston, MA, for defendant.

### DECISION AND ORDER

LAGUEUX, Senior District Judge.

Plaintiff filed the present action seeking an order vacating the arbitration award ("Award") to reinstate, with specific conditions, plaintiff's employee, Barbara Coderre ("Coderre"). For its part, defendant filed a counterclaim seeking an order to enforce the award. The case is before this Court on cross motions for summary judgment.

The memoranda of law in support of the respective motions for summary judgment attempt to answer one fundamental question: does the decision of Arbitrator James S. Cooper ("Arbitrator") to reinstate Coderre, with specific conditions, violate a dominant, well-defined and explicit public policy? After close examination of existing case law, this Court concludes that the Arbitrator's Award ordering the conditional reinstatement of Coderre does not violate the well-established public policy of detecting, preventing and punishing fraud and forgery in the WIC program. Therefore, this Court denies plaintiff's motion for summary judgment and the Court grants summary judgment to defendant on the counterclaim.

### Background

Shaw's Supermarkets, Inc. ("plaintiff") filed this action on February 25, 2002 against United Food and Commercial Workers Union, Local 791, AFL–CIO ("defendant") pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (2000) and the Federal Arbitration Act, 9 U.S.C. § 10 (2000). Plaintiff seeks an order vacating the December 7, 2001 Award ("Award") of the Arbitrator.

Plaintiff and defendant are parties to a collective bargaining agreement ("CBA") which, for purposes of this case, covers the period July 28, 1997 to July 27, 2001. The CBA includes a management rights clause which permits plaintiff to discharge employees for "proper cause" and a provision for final and binding arbitration of grievances arising under the agreement. The parties submitted a grievance to arbitration in order to resolve whether plaintiff had just cause to suspend its employee, Coderre on February 4, 2000 and then subsequently terminate her on February 8, 2000. In his December 7, 2001 Opinion and Award, the Arbitrator made numerous findings of fact. In order to place the present case in its proper context, this Court will summarize the Arbitrator's findings.

### I. The WIC Program

Plaintiff operates a large chain of supermarkets in Massachusetts and Rhode Island including thirty-eight stores repre-

sented by defendant in southeastern Massachusetts and Rhode Island. The store at issue is located in North Providence, Rhode Island. The North Providence store relies on its participation in the Rhode Island Women Infant and Children ("WIC") Program in addition to customers' use of food stamps for approximately twenty-five percent of its weekly revenue. The WIC and food stamp programs provide subsidies to individuals whose income or circumstances warrant government assistance to provide for their well-being. The Rhode Island Department of Health ("RIDOH") administers the WIC Program through a Vendor Participation Agreement between the Department and the Employer. Plaintiff participated as an Employer under this Agreement which specifies a series of Check Redemption Terms and a Vendor Compliance (sanctions) Policy. Plaintiff trains its cashiers in WIC policy through classroom instruction and hands-on experience.

In short, the WIC Program requires a customer with a WIC check to present proper identification indicating that the customer is eligible to sign the check. The store clerk then writes the total price of the eligible foods on the check, whereupon the customer signs the check in the presence of the clerk. If the incorrect amount is written on the check, the price may be corrected, but the customer must once again sign the check. Any WIC check which is not properly executed in accordance with the WIC Vendor Participation Agreement and the WIC Vendor Policies is void and may not be deposited in plaintiff's account. An improperly executed check is counted as a short for plaintiff's Checkout Manager.

## II. *Barbara Coderre*

Coderre was the Checkout Manager at the North Providence store prior to her February 4, 2000 suspension and subsequent termination on February 8, 2000. She had served in that capacity since September 1998. Coderre had been employed by plaintiff in Massachusetts and Rhode Island for nine years prior to arriving at the North Providence store. She testified during the arbitration that she had never received formal WIC training, but had learned what was required of her by working on the job. Although it was unclear to the Arbitrator whether a service desk manager or another checkout manager informed Coderre that she should sign the purchaser's names to unsigned checks, the Arbitrator concluded that there was sufficient evidence to find that at some point during her employment, an employee in a managerial position told Coderre to sign customers' signatures on unsigned WIC checks.

The Arbitrator further found that by the time Coderre arrived at the North Providence store, she was accustomed to doing that. She explained during the arbitration that she primarily signed WIC checks which had been signed by the customer but required a second signature due to an error in the amount which had been entered on the check. Although the correct amount would be entered on the check, the checkout clerk did not always secure the customer's second signature which was required by WIC policy for the purpose of verifying the price change. Although Coderre warned her cashiers about being careless, if the same cashiers made this mistake repeatedly, she informed the store manager of the ongoing problem. The manager, however, never issued additional warnings nor implemented additional employee training sessions. Nevertheless, the bookkeepers and service desk manager routinely left Coderre with unsigned WIC checks with the expectation that she would sign them and return them to the service desk.

During December of 1999, however, plaintiff's store manager learned that Coderre was forging customer signatures and an investigation ensued which culminated with Coderre's termination in early February 2000. Nevertheless, it is undisputed that Coderre was in all other respects an effective employee who had provided plaintiff with a solid performance and who had met the expectations of her employer.

### III. The Arbitrator's Award

In the Award, the Arbitrator concluded that Coderre had intentionally forged customer names to vouchers tendered to plaintiff under the WIC Program. The Arbitrator found that the forgery was in violation of plaintiff's policy prohibiting the forging of WIC check signatures. The Arbitrator also recognized that RIDOH had the authority to impose sanctions on the North Providence store for these violations and that, had the store lost its license, the result would have been financially devastating.

Nevertheless, the Arbitrator found that there was only a very small chance that plaintiff would lose its license as a WIC vendor. Indeed, the Arbitrator acknowledged that the WIC Policies intend to give a company the opportunity to correct a problem before sanctions are imposed, because without vendors, the WIC program would be unable to provide its participants with necessary food items. In other words, the Arbitrator found that plaintiff had numerous opportunities to take corrective action in order to prevent future forgery of WIC checks. Furthermore, it was evident to the Arbitrator that the store culture sought to protect plaintiff from careless mistakes and miniscule losses. Thus, the Arbitrator concluded that to place all the blame on Coderre for a long-standing systemic problem was simply unfair. As a result, the Arbitrator concluded

that plaintiff did not have just cause to terminate Coderre from her employment as a Shaw's Checkout Manager. The Arbitrator held that plaintiff did have just cause to discipline Coderre, but that the discipline had to be proportionate to the wrong she had committed. Thus, the Arbitrator concluded that plaintiff had just cause to suspend Coderre for two weeks and to demote her to the position of Assistant Checkout Manager until plaintiff was satisfied that Coderre would adhere to plaintiff's policies. The Arbitrator also held that plaintiff had just cause to issue Coderre a final warning that any further forgery of a WIC check would result in her termination. The Award likewise stated that plaintiff should retrain Coderre in WIC Policies. The Award concluded by ordering plaintiff to reinstate Coderre and to make her whole for any lost wages and benefits.

### IV. The Present Action

Plaintiff subsequently filed this action on February 25, 2002 seeking an order vacating the December 7, 2001 Award. Plaintiff sets forth three counts in the complaint. In Count I, plaintiff alleges that the Award failed to draw its essence from the CBA between the parties, because the Arbitrator exceeded his authority under the CBA by substituting his own notions of industrial justice for the bargained-for-agreement of the parties. Plaintiff claims in Count II that by issuing the December 7, 2001 Award and by refusing to rule upon plaintiff's February 15, 2002 Motion for Clarification in his Supplementary Opinion, the Arbitrator exceeded his powers, or so imperfectly executed them that a mutual, final and definite award was not made thereby violating 9 U.S.C. § 10(a)(4) of the Federal Arbitration Act. Plaintiff also claims in Count II that by declining to rule upon plaintiff's Motion for Clarification, the Arbitrator was guilty of misconduct

under 9 U.S.C. § 10(a)(3).[1] As for Count III, plaintiff alleges that WIC rules and regulations in addition to state and federal laws concerning forgery of government documents and forgery in connection with public assistance programs reflect a dominant, well-defined and explicit public policy which prohibits the reinstatement of Coderre. For its part, defendant filed a counterclaim asking this Court to enforce the award and to order plaintiff to comply with the Arbitrator's decision.

On August 29, 2002, plaintiff filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. Defendant objected to the motion and moved for summary judgment on the counterclaim. A hearing was scheduled on the matter.

Thereafter, on January 21, 2003, this Court held a hearing on the cross motions for summary judgment. At the conclusion of the hearing the Court took the matter under advisement. The parties have briefed the issues at length and the matter is now in order for decision.

*Discussion*

### I. *Standard of Review*

Rule 56 of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The fundamental question is whether a genuine issue of material fact exists. A genuine issue is one "supported by such evidence that a reasonable jury, drawing favorable inferences, could resolve it in favor of the non-moving party." *Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 317 F.3d 16, 19 (1st Cir.2003)(internal quotation marks omitted). Likewise, a material fact is one which "might affect the outcome of the suit under the governing law." *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

On a motion for summary judgment, the moving party bears the initial burden of showing that there are no genuine issues of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden may be met by demonstrating to the court that a lack of evidence exists to support the nonmoving party's case. *Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 39 (1st Cir.2002). Upon discharging that burden, the nonmoving party must show that the trier of fact could reasonably find in favor of the nonmoving party with respect to each issue on which that party has the burden of proof at trial. *Id.* In the end, the court must view all evidence and related inferences in the light most favor-

---

**1.** In its motion for summary judgment, plaintiff discussed the public policy issue at length as it relates to Counts I and III, but failed to address the question of the Arbitrator's misconduct as it relates to the Arbitrator's refusal to grant plaintiff's Motion for Clarification as alleged in Count II. Although plaintiff moved for summary judgment on all counts, the only discussion of Count II was in the complaint itself. Consequently, the bare allegations in the complaint would not permit a reasonable

fact finder, drawing all inferences in favor of defendant, to find for plaintiff on Count II. Given this Court's discussion below regarding the limited circumstances in which a district court may overturn an arbitration award, this Court concludes that the Award must be enforced as written. Therefore, defendant's cross motion for summary judgment as it relates to Count II of plaintiff's complaint is granted.

able to the nonmoving party. *Id.* "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir.1995). Indeed, as this writer has previously explained, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.*, 777 F.Supp. 167, 169 (D.R.I.1991). Cross motions for summary judgment do not alter the well-established Rule 56 standard. *Adria Intern. Group, Inc. v. Ferre Dev.*, 241 F.3d 103, 107 (1st Cir.2001). Rather, the motions simply require this Court to determine whether either party deserves judgment as a matter of law on the undisputed facts. *Id.*

## II. *U.S. District Court Review of Arbitration Awards*

■ It is well-established that a district court's ability to review an arbitrator's decision is severely limited. The United States Supreme Court has stressed that "a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one." *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 764, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). The Supreme Court recently reaffirmed this principle in *Eastern Assoc. Coal Corp. v. United Mine Workers of Am.*, 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000), in which it stated that a court should only set aside an arbitrator's interpretation of the meaning of a CBA in "rare circumstances." The First Circuit has followed this principle and cautioned that judicial review of arbitration awards is "extremely narrow and exceedingly deferential." *Keebler Co. v. Truck*

*Drivers, Local 170*, 247 F.3d 8, 10 (1st Cir.2001)(internal quotations omitted). The Circuit has recognized that "disputes that are committed by contract to the arbitral process almost always are won or lost before the arbitrator. Successful court challenges are few and far between." *Teamsters Local Union No. 42 v. Supervalu, Inc.*, 212 F.3d 59, 61 (1st Cir.2000). The rationale for insulating arbitration awards from judicial review is based in the federal statutes which regulate labor-management relations. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). The statutes manifest a preference for settling labor disputes in the private realm without government intervention. *Id.* (explaining that The Labor Management Relations Act of 1947, 29 U.S.C. § 173(d) (2000) provides that "[f]inal adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.")

■ It is evident to this Court that the parties in the present case bargained for an arbitration clause in the CBA, and thus made a conscious decision to have their disputes resolved by an arbitrator instead of a U.S. District Court. *W.R. Grace*, 461 U.S. at 764, 103 S.Ct. 2177. By adopting an arbitration clause, the parties agreed in advance to accept the Arbitrator's view of the facts and interpretation of the CBA. *Misco*, 484 U.S. at 37–38, 108 S.Ct. 364. This writer, therefore, may not simply reject the Arbitrator's factual findings even if the Court disagrees with them. *Id.* at 38, 108 S.Ct. 364. Furthermore, with regard to contract interpretation, while an arbitrator may not ignore the "plain language" of a collective bargaining agreement, this Court should not set aside an award simply because it believes the

arbitrator misread the CBA. *Id.* Likewise, when a CBA contemplates that an arbitrator will determine remedies for contract violations, "courts have no authority to disagree with his honest judgment in that respect. If the courts were free to intervene on these grounds, the speedy resolution of grievances by private mechanisms would be greatly undermined." *Id.* Consequently, provided "the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," the fact that a court believes the arbitrator committed "serious error" does not justify overturning his decision. *Id.* This Court, therefore, is bound to enforce the Award and may not review the merits of the contract dispute provided the Award draws its essence from the collective bargaining agreement. *W.R. Grace,* 461 U.S. at 764, 103 S.Ct. 2177; *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). In other words, this Court's responsibility is to determine whether the arbitrator's construction of the CBA is at all "plausible." *Keebler,* 247 F.3d at 10.

▆▆▆ Nevertheless, although judicial review of an arbitration award is extremely limited, this writer recognizes that an arbitrator who purports to interpret the language of a CBA must not "write his own prescription for industrial justice." *Supervalu,* 212 F.3d at 65. In other words, "in labor arbitration ... the power and authority of an arbitrator is totally derived from the collective bargaining agreement and ... he violates his obligation to the parties" if he gives his own meaning to the CBA's otherwise clear and unequivocal language. *Poland Spring Corp. v. United Food and Commercial Workers Interna-*

*tional Union, Local 1445,* 314 F.3d 29, 33 (1st Cir.2002)(internal quotation marks omitted). Despite maintaining broad discretion to interpret contractual language that is not inherently clear and unequivocal, an arbitrator may not issue an award that is contrary to public policy. *See W.R. Grace,* 461 U.S. at 766, 103 S.Ct. 2177. Whether a contract as interpreted by an arbitrator violates public policy is a question for the courts. *Id.* The prohibition placed on courts to refrain from enforcing an arbitrator's award which is contrary to public policy is an application of the more general doctrine prohibiting a court from enforcing any contract which violates law or public policy. *Id.* Thus, in order to determine whether Rhode Island has a well-defined public policy prohibiting Coderre's reinstatement, this Court must read "the relevant statutory and regulatory provisions ... in light of background labor law policy that favors determination of disciplinary questions through arbitration when chosen as a result of labor-management negotiation." *Eastern Coal,* 531 U.S. at 65, 121 S.Ct. 462. This writer must note, however, that the Court is not limited to invoking the public policy exception only when an arbitration award violates positive law. *Id.* at 63, 121 S.Ct. 462. Since the question this Court must answer is whether Coderre's reinstatement violates a dominant, well-defined and explicit public policy, this writer must first ascertain the public policy applicable to the case at bar.[2]

### III. *Public Policy*

▆▆▆ Although the parties quibble over the wording in their respective statements of undisputed facts, the parties do not dispute that state and federal rules, regu-

---

2. Counts I and III of the complaint specifically address the Arbitrator's Award and the resulting public policy implications. Conse-

quently, these counts form the crux of plaintiff's motion for summary judgment, and so this Court will address these counts together.

lations and law prohibit forgery and fraud in the WIC program. The Vendor Participation Agreement between plaintiff and RIDOH, specifically states that "[t]he Vendor agrees not ... *to alter a check in any way*" except as provided by the agreement.[3] *Vendor Participation Agreement,* app. II, art. 3(f)(emphasis added). Furthermore, Rhode Island state law criminalizes attempts to defraud the WIC program. *See* R.I. Gen. Laws § 23–13–17 (2001).[4] In fact, RIDOH places such a high priority on the prevention of fraud under § 23–13–17 that it provides a WIC Bulletin entitled "WIC ANTI–FRAUD LAW" to its vendors in order to raise awareness of the law. The Vendor Bulletin describes the purpose of the legislation as an act establishing "criminal fines against WIC Program vendors, clients, staff, or others who defraud or abuse the WIC Program through theft, misapplication or fraudulent obtaining of WIC funds...." *WIC Vendor Bulletin.* Likewise, federal laws and regulations also criminalize fraud in connection with the WIC program.[5]

Thus, it is clear to this Court that preventing, detecting and punishing fraud and forgery in the WIC program is a dominant, well-defined and explicit public policy. *Eastern Coal,* 531 U.S. at 63, 121 S.Ct. 462. Consequently, the dispositive question is whether Coderre's reinstatement violates that policy. *Id.* at 65–66, 121 S.Ct. 462. This writer, however, must determine whether the Award reinstating Coderre violates the public policy against fraud and forgery—not whether her unlawful act per se violates the policy. *Boston Med. Ctr. v. Serv. Employees, Local 285,* 260 F.3d 16, 23, (1st Cir.2001). Whether her fraudulent conduct itself violates any public policy is irrelevant. The Court must undertake a "fact-specific approach" in order to determine the consequences of reinstating Coderre who was found to have engaged in fraudulent conduct. *Id.* at 26.

In *Eastern Coal,* the Supreme Court was required to "assume that the collective-bargaining agreement itself call[ed] for ... [the employee's] reinstatement." 531 U.S. at 61, 121 S.Ct. 462. The Court explained that "because both employer and

---

**3.** For example, the price on a WIC check may be altered if the initial price entered on the check was incorrect. In that case, the price may be corrected, but the checkout clerk must secure an additional signature from the authorized shopper.

**4.** Section 23–13–17(d) states in relevant part:
Every person, party, entity, partnership, corporation ... which embezzles, willfully misapplies, steals, or obtains by fraud ... any funds, assets or property provided under § 7 of the Child Nutrition Act of 1986, 42 U.S.C. § 1756 ... whether received directly or indirectly from the United States department of agriculture or the Rhode Island department of health ... shall, if the amount of funds, assets, or property are of the value of five hundred dollars ($500) or more, be fined not more than ten thousand dollars ($10,000), or if the amount of funds, assets, or property are of a value of less

than five hundred dollars ($500), shall be fined not more than one thousand dollars ($1,000).

**5.** 42 U.S.C. § 1786(p)(1)(Supp.2003) provides for the criminal forfeiture of property and assets that were fraudulently attained by a person convicted of violating the law dealing with food instruments. Such a conviction may result under any federal law "imposing a penalty for embezzlement, willful misapplication, stealing, obtaining by fraud or trafficking in food instruments ... funds, assets, or property." *Id.* § 1786(p)(2).

The Code of Federal Regulations stipulates that "[a] vendor who commits fraud or abuse in the [WIC] program is liable under applicable Federal, State or local laws. Those who have willfully misapplied,. stolen, or fraudulently obtained program funds will be subject to a fine ... or imprisonment. ...." 7 C.F.R. § 246.12(h)(3)(xx) (2003).

union have granted to the arbitrator the authority to interpret the meaning of their contract's language," the Court was required to begin its analysis with the presumption that the employee's reinstatement was warranted. *Id.* Consequently, this Court must presume at the outset that Coderre's reinstatement was valid, because the Arbitrator had the authority to interpret the parties' CBA. Given the limited nature of judicial review in arbitration cases, this is clearly a difficult presumption for plaintiff to overcome.

In its attempt to persuade this Court that the Award violates public policy, plaintiff sets forth several arguments. In its Memorandum in Support of Plaintiff's Motion for Summary Judgment, plaintiff asserts that since it assumes liability for the conduct of its employees in administering the WIC program, plaintiff "should not have the daily burden of following around a known forger to make sure she doesn't forge another WIC check." (Pl.'s Mem. Mot. Summ. J. at 10.) Plaintiff, however, fails to recognize that the Award does not simply order plaintiff to reinstate Coderre in her previous position as Checkout Manager. Rather, the Award specifically seeks to ensure that Coderre will no longer forge documents by "reduc[ing] her to the position of Assistant Checkout Manager *until such time that the Company is satisfied that she understands and follows the Company's policies.* The Company shall retrain Ms.Coderre in the WIC Policies." (Award at 13.)(emphasis added). The Award, therefore, makes clear that until plaintiff is satisfied that Coderre will follow plaintiff's policies—that is, that Coderre will not forge the signatures on any WIC checks—plaintiff need not reinstate her as Checkout Manager. Thus, as a

result of the conditions placed on Coderre's reinstatement, plaintiff will avoid the daily burden of hovering over Coderre to ensure that she complies with WIC protocol.

Plaintiff next argues that "Coderre's reinstatement sends *all* Shaw's employees the wrong message: that they may forge signatures on WIC voucher checks, without any threat of discharge, until caught and punished at least once." (Pl.'s Mem. Mot. Summ. J. at 11.)(emphasis in original). This assertion is deeply troubling, because the Arbitrator specifically found that at least one of plaintiff's managers in the North Providence store actually told Coderre to forge the signatures.[6] (Award at 12.) The Arbitrator further concluded that "[t]here indeed was a culture within the store which sought to protect the Company from stupid mistakes and minuscule losses." (Award at 12–13.) It is highly disingenuous, therefore, for plaintiff to argue that the Award sends Shaw's employees the "wrong message" when in fact plaintiff encouraged the forgery in order to protect the company from financial loss. Thus, if anyone has sent Shaw's employees the "wrong message," it is clearly plaintiff. In an attempt to correct the "long-standing systemic problem" that plaintiff created, the Arbitrator merely sought to uphold the public policy of detecting, preventing, and punishing fraud and forgery in the WIC program by ordering a very specific conditional reinstatement of Coderre. (Award at 13.)

Plaintiff also argues that unless defendant can show "that the public policy advocates rehabilitation of offenders, *and* that the conditions imposed by the Arbitrator

---

**6.** The Arbitrator found that a "Service Department Manager ... had routinely pulled the unsigned WIC checks and told Barbara Coderre to 'do her thing' which meant that she should practice writing the customer's signature and then countersign the portion of the check required for a price change." (Award at 12.)

are in furtherance of such rehabilitation, the Court cannot look to such conditions as justifying the Arbitrator's Award reinstating Coderre." (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 12.) In other words, plaintiff asks this Court to read a *rehabilitative* element into the *Eastern Coal* test. Plaintiff not only asks this Court to determine whether Coderre's reinstatement violates "an explicit, well-defined, and dominant public policy," *Eastern Coal,* 531 U.S. at 63, 121 S.Ct. 462, but to ascertain whether the public policy encourages rehabilitation.

In *Eastern Coal,* the employee was fired on account of having tested positive for marijuana. *Id.* at 60, 121 S.Ct. 462. The employer in that case argued that the Omnibus Transportation Employee Testing Act of 1991 and the Department of Transportation's corresponding implementing regulations established a public policy against reinstating employees who had tested positive for drugs. *Id.* at 63, 121 S.Ct. 462. The Supreme Court, however, disagreed by stating that the Testing Act in reality promulgated several rehabilitative public policies, and thus the arbitrator's award reinstating the employee did not run contrary to a well-defined public policy. *Id.* at 67, 121 S.Ct. 462.

The Supreme Court in *Eastern Coal,* however, never indicated that the public policy must be of a rehabilitative nature. The fact that the policy at issue in *Eastern Coal* encouraged rehabilitation does not support the conclusion that every future policy must do so as well in order to satisfy the *Eastern Coal* test. The Court simply emphasized in that case that the public policy must be "explicit, well defined, and dominant." *Id.* at 63, 121 S.Ct. 462. Had the Court intended for the public policy to be explicit, well-defined, dominant *and* rehabilitative, the Court surely would have stated as much. Consequent-

ly, this writer refuses to read this additional element into the *Eastern Coal* test. Simply put, the public policy of preventing fraud and forgery in the WIC program need not encourage rehabilitation in order for this Court to uphold the Arbitrator's Award.

Nevertheless, even if plaintiff is correct in its assertion that the public policy at issue must advocate rehabilitation and that the conditions placed on Coderre's reinstatement be in furtherance of that rehabilitation, it is clear that the WIC program itself and plaintiff's own Associate's Handbook contemplate rehabilitative action for employee forgery and fraud. The WIC Vendor Policies that were in effect at the time of Coderre's misconduct specifically enumerate the remedial steps to be taken when a violation is detected. The Policies state under the heading "Sanction Steps" that:

(1) if there is a problem, an effort is made to provide educational assistance to the vendor to correct the problem. The vendor shall develop a plan of correction acceptable to [the WIC Program] ... and a notice of violation will be issued. The vendor is made aware that a subsequent review will be made to see if the problem has been resolved. (2) If the review reveals that a problem still exists, a final warning letter is sent. This warning letter, with details of previous actions taken, is to contain a time frame in which compliance is to be expected.

*WIC Vendor Policies,* Sanction Steps(B)(1) & (2). Not only does a violating vendor receive a violation notice as an initial warning, the vendor will receive a final warning letter if a subsequent review reveals that the violation has continued. The vendor will not be disqualified from the WIC program unless the violation continues to persist after the vendor receives the final

warning. Sanction Steps(B)(5). It is clear to this Court, therefore, that WIC Policies give vendors multiple opportunities to correct violations. Consequently, if plaintiff, as a WIC vendor, is not subject to immediate termination when a policy violation is discovered, this Court fails to see why Coderre herself should be subject to immediate termination. Clearly, the WIC policies contemplate giving a violating vendor an opportunity to rectify its misconduct, and thus there is simply no reason not to extend the same deference to plaintiff's employees.

Furthermore, plaintiff's own Associate's Handbook provides for various remedies in the event of employee fraud and forgery. In the complaint, plaintiff quotes from the "Sanctions and Discipline" section of the Handbook which warns employees that "[s]ome types of associate misconduct are so serious ... that they *may* result in an immediate discharge. These offenses include, but are not limited to, ... falsification of company records." (Compl.¶ 37.)(emphasis added). The dispositive word here is *may*. As the First Circuit has explained, the question of whether an arbitrator exceeds his authority often depends on whether the CBA grants open-ended discretion to the arbitrator, or whether the CBA specifically states that certain types of misconduct constitute just cause for immediate discharge. *Crafts Precision Indus. Inc. v. Lodge No. 1836*, 889 F.2d 1184, 1185 (1st Cir.1989).

In *Crafts Precision*, the employer and arbitrator had the discretion to distinguish between employee misconduct which "may" result in suspension from conduct that warrants immediate termination. *Id.* at 1185–86. Unlike in *Poland Spring*, 314 F.3d at 35, where the CBA provided that insubordination *shall* result in immediate termination, the case at bar more closely resembles that of *Crafts Precision*. The First Circuit noted in *Poland Spring* that while an arbitrator wielded discretion in *Crafts Precision*, the CBA in *Poland Spring* "lack[ed] any language that would authorize an arbitrator to distinguish between degrees of [misconduct] ... or permit an arbitrator to select from a variety of disciplinary remedies." 314 F.3d at 35 n. 2. Thus, the fact that plaintiff's own Associate's Handbook provides that an employee *may* be terminated for dishonest conduct inherently means that plaintiff likewise contemplated that an employee may escape termination for that type of misconduct. Therefore, the fact that an employee will not automatically be terminated for dishonest conduct means that other types of remedies—including those encouraging rehabilitation—are viable options. Thus, in light of the Associate's Handbook and the surrounding facts and circumstances, the Arbitrator's conclusion that termination was not warranted in the present case was clearly permissible.

Lastly, plaintiff argues that the Arbitrator did not have the authority to adjust the severity of the punishment imposed by Shaw's, because the company's management reserved to itself the right to terminate employees for proper cause. (Pl.'s Mem. Mot. Summ. J. at 14.) Plaintiff further argues that the Arbitrator had "no power either to add to or subtract from, or to modify any of the terms" in the CBA. *Id.* While this Court need not determine whether the Arbitrator had the authority to adjust the severity of the discipline in all cases, it is clear that the Arbitrator had the power to do so if plaintiff did not terminate Coderre for just cause. As discussed above, the Arbitrator's conclusion that plaintiff did not have just cause to terminate Coderre was, at the very least, "plausible." *Keebler*, 247 F.3d at 10. Furthermore, while the Arbitrator may not have had the power to add to, subtract

from, or modify any of the terms in the CBA, the Arbitrator certainly had the authority to determine whether Coderre had been terminated for "proper cause." Thus, whether Coderre was justly terminated was the fundamental question facing the Arbitrator. Given the limited circumstances in which a district court may overturn an arbitration award, and given the analysis this Court has undertaken today, it is clear that the Award must be enforced.

*Conclusion*

For the aforementioned reasons, plaintiff's motion for summary judgment is denied as to all counts. Defendant's motion for summary judgment on its counterclaim to enforce the arbitration award is granted.

The Court will schedule a hearing on plaintiff's request for attorneys' fees and an award of interest to Coderre. In the meantime, a judgment shall not enter.

It is so ordered.