**Laurence HAZARD, Plaintiff,**

v.

**SOUTHERN UNION COMPANY and United Steel Workers of America, ALF–CIO–CLC, Local 12431, Defendants.**

**C.A. No. 01–556L.**

United States District Court,
D. Rhode Island.

Aug. 6, 2003.

Casby Harrison, Esq., Providence, RI, for Plaintiff.

Anthony Joseph DiOrio, Esq., Jackson Lewis LLP, Cranston, RI, Guy P. Tully, Esq., Jackson Lewis LLP, Boston, MA, Richard M. Peirce, Esq., Adam C. Robitaille, Esq., Roberts, Carroll, Feldstein & Peirce, Providence, RI, for Defendants.

## DECISION AND ORDER

LAGUEUX, Senior District Judge.

Plaintiff filed the present action on November 26, 2001[1] pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 asking this Court to vacate an arbitration award ("Award") in which the arbitrator ("Arbitrator") concluded that defendant Southern Union Company[2] ("Company") did not violate the collective bargaining agreement ("CBA") it had entered into with Local 12431 ("Union"). In the present action, plaintiff alleges that the Company placed him on unpaid administrative leave in violation of the CBA. Plaintiff further contends that the Union breached its duty to represent him fairly during the grievance and arbitration proceedings in which the Union contested the Company's decision to place plaintiff on administrative leave. Plaintiff also alleges that the Union breached its duty of fair representation by refusing to file a grievance challenging the Company's failure to post a notice announcing a temporary stockroom vacancy and the Company's subsequent decision to assign him to that position.

There are three issues currently before this Court. The first is whether the statute of limitations has expired in this hybrid § 301/fair representation case. The second issue is whether the Union breached its duty of fair representation by either failing to file the stockroom/vacancy posting grievance or by inadequately representing plaintiff during the unpaid administrative leave proceedings. The third issue is whether the Company violated the CBA by placing plaintiff on unpaid administrative leave. This writer will address these issues seriatim.

After close examination of existing case law, this Court concludes that the statute of limitations expired before plaintiff brought this suit; and, in any event, the Union did not breach its duty of fair representation, and the Company did not breach the CBA. Therefore, this Court upholds the Arbitrator's Award and grants each defendant's motion for summary judgment.

*Background*

Laurence Hazard, ("plaintiff") filed this action pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (2000)("LMRA"). Plaintiff asks this Court to vacate the Award in which the Arbitrator concluded that the Company did not breach the CBA it had entered into with the Union for the period January 21, 1996 through January 21, 2001. Plaintiff has also brought this suit against the Union for breach of the duty of fair representation during the arbitration proceedings and for breach of the same duty based on the Union's refusal to file a grievance challenging the Company's decision to assign plaintiff to a temporary stockroom position.

Plaintiff was employed by the Company in its meter repair department and a member of the Union throughout his employment.[3] The meter repair department em-

---

**1.** Plaintiff filed an amended complaint on February 19, 2002.

**2.** Providence Gas Company was acquired by Southern Union Company. The Company

currently operates under the name New England Gas Company.

**3.** The terms and conditions of plaintiff's employment were governed by the provisions of

ployed six people. In the department, only Michael Baptiste ("Baptiste") was more junior than plaintiff in overall company-wide seniority. The remaining four members of the department enjoyed greater seniority than plaintiff.

In the summer of 2000, a full time messenger and one of three stockroom employees of the Providence Gas Company were scheduled to retire. The Company determined that there was not enough work to maintain a full time messenger and three stockroom workers. As a result, the Company intended to subcontract the messenger position and to eliminate the third stockroom position. After negotiating with the Union, however, the Company agreed not to subcontract the messenger position and instead to create a messenger/stockroom bargaining unit position. Although the new position was only temporary, the Company realized it would need a second employee to fill in for the messenger/stockroom worker when that employee was not at work.

Nevertheless, after reviewing the staffing in the various departments, the Company was unable to find a backup employee to train. As a result, Union President Ray Conroy ("Conroy"), a meter repair department employee, suggested to the Company that one of the meter repair shop employees could serve as the backup on a trial basis in order to keep the job in the bargaining unit. The Company agreed and decided to train Baptiste, because he was the most junior employee in the department. The Company was aware that Baptiste was unhappy with the new arrangement. It grew suspicious when Baptiste called in sick the week he was to begin training for the backup position. The Company hired a private investigator who videotaped Baptiste working as a landscaper and a cook during the period in which he had claimed to be sick. Baptiste,

therefore, was suspended. When he returned from the suspension, Baptiste bid on, and was awarded, a job outside the meter repair department.

As a result of the transfer, plaintiff became the least senior member of the department and was thus the next in line to be trained for the new position. He was scheduled to begin training on Monday, October 23, 2000. On Friday, October 20, 2000, however, plaintiff's physician, Dr. Bouchard, sent the Company a letter informing it that plaintiff was "physically unable to work in a position that will require him to be in and out of vehicles, lifting, bending and reaching." (Award at 4.) The letter informed the Company that plaintiff should continue to work at his current position, because while plaintiff's back problems were stable at that time, to change his work status could potentially create unnecessary physical problems. Despite Dr. Bouchard's warning, however, plaintiff worked the balance of Friday, October 20, 2000 without complaining of any back problems.

The Company circulated the note from Dr. Bouchard on that day and discussed what to do under the circumstances. Since the letter raised the possibility that the new position would further aggravate plaintiff's back problems, the Company determined that plaintiff should not begin his training, which was the very next task that plaintiff was scheduled to perform. As a result, plaintiff was not allowed to work on Monday, October 23, 2000. After receiving Dr. Bouchard's letter, the Company was also concerned about whether plaintiff should continue to perform his current job in the meter repair department, since it was at least as physically demanding as the new temporary messenger/stockroom position. As a meter repairman, plaintiff was required to lift meters weighing 45–50

the CBA entered into between the Union and the Company.

pounds by himself and heavier meters with the help of other employees. Plaintiff's position in the department also required bending and reaching.

The questions surrounding plaintiff's physical capabilities were further complicated by the fact that plaintiff did not claim to be presently suffering from any injury or illness. Plaintiff had not claimed to have suffered a worker's compensation injury, and through the close of business on Friday, October 20, 2000, plaintiff worked as a meter repairman without complaint or incident.[4] As a result, the Company determined that plaintiff was not eligible for sick leave under the CBA in effect at that time.[5] Nevertheless, the Company placed plaintiff on administrative leave, without pay but with benefits, because Dr. Bouchard's letter noted the risk of injury to plaintiff's back if he performed the duties that were essential to his meter repair position.[6] The Company notified plaintiff that he was eligible to return to work as soon as a position was available that he could safely perform or when he could perform the essential functions of his position with or without reasonable accommodation.[7]

In November 2000, the Union filed a grievance on plaintiff's behalf seeking sick leave benefits. During the grievance process, the Company requested that Dr. Bouchard clarify whether plaintiff could perform the essential functions of his current position or those of the messenger/stockroom position. The Company's health nurse wrote to Dr. Bouchard and enclosed with the letter a comprehensive job description for both positions. At that point, plaintiff admitted that as of the October appointment, he had provided Dr. Bouchard with only a partial job description.

After receiving the Company's inquiry, Dr. Bouchard acknowledged in a letter dated December 4, 2000, that as a result of the additional information provided by the Company, he had a fuller understanding of the essential functions of both positions. As a result, he determined that plaintiff could return to his current position after physical therapy. In the December letter, however, Dr. Bouchard made reference to a recent exacerbation of plaintiff's back condition. This reference created additional confusion for the Company, because plaintiff had not reported to work since October and had not complained of any injury sustained outside of work.[8]

On May 9, 2001, an arbitration hearing was conducted on the denial of sick benefits. In the Award dated July 9, 2001, the Arbitrator ruled in favor of the Company and denied plaintiff's grievance. The Arbitrator concluded that plaintiff "was not a

---

**4.** Prior to plaintiff's appointment with Dr. Bouchard, plaintiff did not suffer an injury or illness at work. Furthermore, none of the medical documentation submitted by plaintiff or by the Union indicated that plaintiff suffered any recent acute illness or injury. Plaintiff never reported to anyone that he had experienced any pain.

**5.** Plaintiff was not eligible for sick leave under the CBA, because Dr. Bouchard's letter did not establish that plaintiff was suffering from an illness or injury. Plaintiff was not paid, because there was no provision under the CBA which permitted the Company to pay him. Plaintiff was not working and so was ineligible for wages. By his own admission, plaintiff was not suffering from a sickness or injury, and thus was not entitled to sick pay.

**6.** The Company had a limited light duty program for employees who suffered a work-related injury. Plaintiff, however, was not offered light duty, because he did not suffer an injury at work.

**7.** Plaintiff ultimately returned from leave in March 2001.

**8.** Plaintiff testified at his deposition that he believed he was able to work during the first week of December 2000.

particularly credible witness at the arbitration hearing" and that he had provided misinformation to Dr. Bouchard between October 20, 2000 and December 4, 2000 about his medical condition. (Award at 8.) The Arbitrator wrote that plaintiff "elected to mislead his doctor, in his ill-advised effort to avoid the messenger work." [9] (*Id.*) On July 10, 2001, the day after plaintiff received a copy of the Award, plaintiff began a leave of absence from work due to stress and a major depressive disorder. Plaintiff returned from that leave on June 11, 2002. During the period July 2001 to January or February 2002, plaintiff collected Temporary Disability Insurance payments from the State of Rhode Island and a sick leave benefit from the Company.[10] Starting in January or February 2002, plaintiff received payments under a Long Term Disability Benefit Plan. Plaintiff is currently assigned to the same job in the meter repair department as that which he performed prior to being placed on leave in October 2000.

On November 22, 2002 the Company and the Union filed motions for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff objected to the motions, and a hearing was scheduled on the matter. At the conclusion of the hearing, the Court took the matter under advisement. The parties have briefed the issues and the matter is now in order for decision.

*Discussion*

I. *Jurisdiction and Standard of Review*

 A. Jurisdiction

 Plaintiff filed this action pursuant to Section 301 of the LMRA. Ordinarily, neither state nor federal courts have jurisdiction over claims directly pertaining to those sections of the LMRA dealing with the rights of employees in the context of collective bargaining procedures and unfair labor practices. *Vaca v. Sipes,* 386 U.S. 171, 179, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Congress sought to avoid the adoption of conflicting labor relations rules by leaving the development of those rules and accompanying substantive law in the hands of the National Labor Relations Board. *Id.* at 180–181, 87 S.Ct. 903. As a result, an employee is ordinarily required to exhaust any grievance or arbitration remedies provided by the CBA, and the employee is normally bound by the result of the arbitration proceeding. *DelCostello v. Teamsters,* 462 U.S. 151, 163, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).

 This preemption doctrine, however, does not apply to cases involving an alleged breach of a union's duty of fair representation. *Vaca,* 386 U.S. at 181, 87 S.Ct. 903. The Supreme Court pointed out in *Vaca* that "the question of whether a union has breached its duty of fair representation will in many cases be a critical issue in a suit ... charging an employer with a breach of contract." *Id.* at 183, 87 S.Ct. 903. As it is well-established that an individual employee may file suit against an employer for breach of a CBA, *DelCostello,* 462 U.S. at 163, 103 S.Ct. 2281, the Supreme Court in *Vaca* concluded that Section 301 of the LMRA permits an employee to file a hybrid cause of action based on a breach of contract claim against the employer and the subsequent failure to remedy that breach due to the intervening failure of the union to represent the em-

---

**9.** Plaintiff admitted during his deposition that he did not want to train for the stockroom/messenger position, because he viewed the job as demeaning.

**10.** On January 21, 2002, the Company locked out members of the Union. As a result, plaintiff received food distributions from the Union during the lockout period. Approximately six weeks after the lockout commenced, plaintiff began receiving between fifty to one hundred dollars per week from the Union as a strike benefit.

ployee fairly. 386 U.S. at 177, 87 S.Ct. 903. As a result, this Court has jurisdiction over the present matter, because plaintiff has filed a hybrid action by alleging that the Company breached the CBA (Am.Compl.¶ 9) and by alleging that the Union breached its duty to represent plaintiff's interests fairly during the arbitration proceedings. (Am.Compl.¶ 18.)

### B. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The critical inquiry is whether a genuine issue of material fact exists. A genuine issue is one "supported by such evidence that a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party." *Hershey v. Donaldson, Lufkin & Jenrette Securities Corp.*, 317 F.3d 16, 19 (1st Cir.2003)(internal quotation marks omitted). Furthermore, a material fact is "one 'that might affect the outcome of the suit under the governing law.'" *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

■ On a motion for summary judgment, the moving party bears the initial burden of showing that there are no genuine issues of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden may be met by showing the Court that a lack of evidence exists to support the nonmoving party's case. *Rochester*

*Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir.2002). Upon discharging that burden, the nonmoving party must demonstrate that the trier of fact could reasonably find in the nonmoving party's favor with respect to each issue on which that party has the burden of proof at trial. *Id.* In the end, the Court must view all evidence and related inferences in the light most favorable to the nonmoving party. *Id.* "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir.1995). Indeed, as this writer has explained, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.*, 777 F.Supp. 167, 169 (D.R.I.1991).

■ Although the Court may not grant summary judgment simply because the facts offered by the moving party appear to be the most credible, when a plaintiff fails to provide the Court with a Statement of Disputed Material Facts as required by Local Rule 12.1, the Court accepts as true the facts provided by defendants in their statements of undisputed facts accompanying their motions for summary judgment. *D'Oliviera v. Rare Hospitality Int'l, Inc.*, 150 F.Supp.2d 346, 349 (D.R.I.2001). Local Rule 12.1 provides that "[a]ny party opposing . . . a motion [for summary judgment] shall serve and file, together with the opposing memorandum of law required under Rule 12 of these Rules, a concise statement of all material facts as to which he contends there is a genuine issue necessary to be litigated." D.R.I. R. 12.1(a)(2). Although plaintiff's counsel has attempted to set forth seven disputed issues of material fact in his memorandum opposing the motions for summary judgment, Local Rule

12.1 clearly requires plaintiff to file a separate statement of undisputed facts in conjunction with the memorandum opposing the motion for summary judgment.

 The First Circuit has warned that "noncompliance with ... a [local] rule, as manifested by a failure to present a statement of disputed facts ... justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted...." *Ruiz Rivera v. Riley*, 209 F.3d 24, 28 (1st Cir.2000). As the Circuit noted in *Rivera*, federal courts are concerned that, "absent such rules, summary judgment practice could too easily become a game of cat-and-mouse, giving rise to the 'specter of district court judges being unfairly sandbagged by unadvertised factual issues.'" *Id.* (quoting *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 931 (1st Cir.1983)). Since the local rules provide a structured framework for the summary judgment process, parties ignore the rules at their own peril. *Id.* at 28. Thus, plaintiff's failure to file a statement of disputed facts pursuant to Local Rule 12.1 results in this Court adopting the facts provided by defendants in their respective statements of undisputed facts. This writer, therefore, will address the questions of law in light of those facts. *D'Oliviera*, 150 F.Supp.2d at 349.

## II. *Statute of Limitations*

 The relevant statute of limitations in a hybrid action with respect to both the breach of contract claim against the Company and the fair representation claim against the Union is six months, as dictated by Section 10(b) of the NLRA. *Demars v. Gen. Dynamics Corp.*, 779 F.2d 95, 97 (1st Cir.1985). The plaintiff must not only prove the breach of contract, he must also prove that the Union breached its duty of fair representation. Hence, the cause of action accrues when plaintiff received "notice of the alleged union wrongdoing." *Id.* (internal quotations omitted). Consequently, this Court must determine in the present case when plaintiff became aware that the Union decided not to grieve plaintiff's assignment to the stockroom position and the corresponding failure of the Company to post a vacancy notice for that position. Viewing the evidence in the light most favorable to plaintiff, it is clear to this Court that plaintiff became aware that the Union would not file a grievance relating to the stockroom position and vacancy posting no later than May 9, 2001. Since plaintiff filed suit in this Court on November 26, 2001, plaintiff may not recover under a § 301/fair representation cause of action if he had notice of any alleged wrongdoing on the part of the Union prior to May 26, 2001.

Plaintiff asserted in his deposition that he had sought two grievances. (Pl.'s Dep. at 86.) Plaintiff claims he sought one grievance challenging his assignment to the stockroom position based on a violation of (1) his seniority rights and (2) the CBA's requirement that all job vacancies be posted. (*Id.*) There is substantial disagreement over precisely when plaintiff knew that the Union would not file this grievance. The Union argues in its Memorandum in Support of its Motion for Summary Judgment that plaintiff knew well over a year before he filed this suit that the Union would not file a stockroom/vacancy posting grievance. (Union Mem. Summ. J. at 13). Indeed, the Union argues that plaintiff knew that this grievance would not be filed as early as October 23, 2000.[11] (*Id.* at 11–12.)

---

11. The Union offers plaintiff's testimony during his deposition in support of this contention. The Union points to plaintiff's assertion that he asked Conroy to file a grievance con-

testing a violation of his seniority rights and that Conroy's response was "[i]t's not a grievable issue." (Pl.'s Dep. at 87.) Consequently,

■ The Union correctly acknowledges, however, that for purposes of a summary judgment motion, the evidence must be viewed in the light most favorable to the nonmoving party and that the Court must draw all reasonable inferences in favor of that party. *Hershey*, 317 F.3d at 19. Consequently, this Court must adopt the version of events most favorable to plaintiff. As a result, this Court concludes that plaintiff did not know that the Union would not pursue the stockroom position/vacancy posting grievance until May 9, 2001 the day of the arbitration proceedings—because in the midst of plaintiff's deposition testimony, plaintiff acknowledged that this was the day he discovered that the grievance would not be pursued. (Pl.'s Dep. at 88, 211.) Thus, even assuming that plaintiff did not know about the Union's alleged wrongdoing until May 9, 2001, plaintiff clearly knew prior to May 26, 2001 that the Union would not pursue the stockroom position/vacancy posting grievance. As such, the statute of limitations on plaintiff's hybrid cause of action expired on November 9, 2001.

■ Plaintiff also asserts that he sought a second grievance relating to his placement on administrative leave without pay. The Union did, in fact, pursue this grievance. As a result, plaintiff's claim against the Union in this regard is for inadequate representation during the grievance and arbitration proceedings. Although neither the Union nor the Company claims that the statute of limitations expired with regard to plaintiff's inade-quate representation claim, it is evident that the statute of limitations expired prior to plaintiff filing that claim as well.

■ In the amended complaint, plaintiff alleges a conflict of interest on the part of Conroy, the President of the Union who represented plaintiff at the arbitration. (Am.Compl.¶ 16(a)). The Court, therefore, must determine when plaintiff became aware of this alleged wrongdoing on the part of the Union. *Demars*, 779 F.2d at 97. It is evident from plaintiff's deposition testimony that he never requested that anyone other than Conroy serve as his representative. (Pl.'s Dep. at 186.) Plaintiff likewise never asked Conroy to hire a lawyer to represent plaintiff during the arbitration. (*Id.*) It is clear, however, from plaintiff's deposition that plaintiff believed Conroy had a conflict of interest in serving as his advocate at the time of the arbitration proceeding itself.[12] In fact, plaintiff has failed to present the Court with *any* evidence that indicates that plaintiff did not know at the time of the arbitration all the facts on which he now bases his conflict of interest claim. Thus, plaintiff knew about the Union's alleged wrongdoing with regard to Conroy's conflict of interest as of May 9, 2001. Since the cause of action accrues when a "plaintiff knows, or reasonably should know, of the acts constituting the union's wrongdoing," the statute of limitations with regard to the administrative leave grievance began to run on May 9, 2001 when it was clear that plaintiff knew of Conroy's al-

the Union asserts that when Conroy made that assertion, the statute of limitations began to run, because at that moment plaintiff knew that the Union would not file the grievance on his behalf.

12. Plaintiff stated during his deposition that Conroy:

[R]eally never tried to represent me, as far as I'm concerned, for the simple reason that he's the one that went to the company to try to get this job … because he wanted the job that I was doing in the Proving Room. And he admitted it more than once to myself and Michael Baptiste. He said that he should be in there instead of us. He said we were screwing him.

(Pl.'s Dep. at 188.)

leged conflict of interest. *Graham v. Bay State Gas Co.*, 779 F.2d 93, 94 (1st Cir. 1985). Consequently, the statute of limitations expired as to this hybrid § 301/fair representation claim on November 9, 2001.[13]

### III. *Hybrid § 301/Fair Representation Actions*

Nevertheless, even if this Court were to conclude that plaintiff filed this action before the statute of limitations expired, after viewing all the evidence and related inferences in the light most favorable to plaintiff, this Court concludes that no reasonable fact finder could find that the Company breached the CBA and that the Union breached its duty of fair representation.

■■■ In a hybrid cause of action, plaintiff must prove both that the Company breached the CBA and that the Union breached its duty of fair representation. *DelCostello*, 462 U.S. at 164–65, 103 S.Ct. 2281. The claims against the employer and the union are "inextricably interdependent." *Id.* This means that plaintiff must provide "sufficient evidence from which a reasonable factfinder can conclude not only that the discharge was improper but also that the union's breach undermined the grievance process and thereby contributed

to the error." *Mulvihill v. Top–Flite Golf Co.*, 335 F.3d 15, 20–21 (1st Cir.2003).

### A. Duty of Fair Representation

■■■ In order to succeed in a suit alleging a breach of the duty of fair representation, plaintiff must show that the Union acted in a manner that was "arbitrary, discriminatory, or in bad faith." *Miller v. United States Postal Serv.*, 985 F.2d 9, 11 (1st Cir.1993)(quoting *Vaca*, 386 U.S. at 190, 87 S.Ct. 903). The Union's actions, however, are arbitrary only if the Union's "behavior is so far outside a wide range of reasonableness as to be irrational." *Id.* at 12 (internal quotations omitted).

■■■ With regard to the stockroom position/vacancy posting, the Union made the determination that the matter was not grievable. Consequently, plaintiff must prove that the Union acted in an arbitrary manner in reaching this conclusion. The Union's "mere negligence or erroneous judgment will not constitute a breach of the duty of fair representation." *Id.* The First Circuit has emphasized that a union should be given "great latitude in determining the merits of an employee's grievance and the level of effort it will expend to pursue it." *Id.* As the Supreme Court emphasized in *Vaca*, if an "individual employee could compel arbitration of his

---

**13.** Even if the statute of limitations had not yet expired with regard to plaintiff's fair representation claim, plaintiff has clearly waived his conflict of interest claim. Plaintiff failed to raise his concerns regarding the ability of Conroy to represent plaintiff during the grievance and arbitration proceedings. The First Circuit emphasized in *Early v. Eastern Transfer*, 699 F.2d 552, 558 (1st Cir.1983), that a party must ordinarily raise a claim of personal bias or conflict of interest when it could have been raised at the hearing to which it applies. As discussed above, plaintiff admitted in his deposition testimony that he was aware of the alleged conflict of interest prior to the arbitration proceeding. Had plaintiff

raised the alleged conflict of interest prior to the arbitration hearing, the Union might have appointed an alternate official to represent plaintiff. *See id.* Although it was the arbitrator who was allegedly biased in *Early*, the rationale employed by the First Circuit is applicable to the case at bar. That is, this Court "cannot accept that parties have a right to keep two strings to their bow—to seek victory before the tribunal and then, having lost, seek to overturn it for bias never before claimed." *Id.* Thus, plaintiff has waived his conflict of interest claim, because he knew of the alleged bias at the time of the arbitration and failed to raise it during that proceeding.

grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation." 386 U.S. at 191, 87 S.Ct. 903. Thus, the Union's failure to pursue the stockroom position/vacancy posting grievance "constitutes a breach of the duty of fair representation only when the union's otherwise good faith decision is arbitrary." *Miller*, 985 F.2d at 12.

In the present case, plaintiff alleged in his complaint that the Union conspired with the Company "to arbitrarily assign [p]laintiff to fill a vacancy outside of [p]laintiff's Meter Repair Department without posting the vacancy" so that Conroy and Union officer, George Hathaway ("Hathaway") could obtain plaintiff's qualified and preferred status. (Am. Compl.¶ 13.) Plaintiff also contends that the Union and the Company retaliated against plaintiff when he complained about the "wrongful taking of his status and job rights" by assigning plaintiff to demeaning work assignments and by placing plaintiff on unpaid administrative leave. (*Id.* ¶ 14.) Plaintiff, however, has failed to provide *any* evidence in support of these assertions. In plaintiff's memorandum opposing the Union's motion for summary judgment, plaintiff argues that Conroy refused to grieve the stockroom position/vacancy posting, because it would "unravel ...

[his] ulterior motive...." (Mem. Opp'n Summ. J. at 5.) Plaintiff, however, fails to cite any depositions, answers to interrogatories, admissions on file, or affidavits in support of his contentions. Simply put, plaintiff cannot survive a motion for summary judgment simply by alleging in his amended complaint that the Union acted in an arbitrary manner. Thus, even if the statute of limitations had not expired as of November 9, 2001, it is clear to this Court that no reasonable fact finder could find in favor of plaintiff based on these mere assertions.[14]

Lastly, this Court must determine whether the Union breached its duty to represent plaintiff fairly during the proceedings contesting the Company's decision to place plaintiff on unpaid administrative leave. Plaintiff alleges that the Union breached its duty, because (1) Conroy, his representative at the arbitration hearing, "had a vested interest in the outcome of the proceeding and a conflict of interest because he expressly supported the ... [Company's] decision to place [p]laintiff on unpaid leave," (2) the Union failed to present and argue plaintiff's case during the arbitration by not exerting its "best efforts to obtain and present witnesses and documentary evidence" that were favorable to plaintiff;[15] (3) that the Union intentionally "misconstrued the issues to be presented and resolved" at the arbitration; and (4) that the "Union was

14. Furthermore, plaintiff's counsel appears to be confused in his opposition memorandum. Counsel argues that plaintiff asked Conroy to file a grievance concerning the Company's failure to post the stockroom vacancy pursuant to Article XI of the CBA. (Mem. Opp'n Summ. J. at 5.) Plaintiff's counsel then asserts, however, that although Conroy initially refused, a grievance was eventually filed after plaintiff sought assistance from a Union steward. (*Id.*) This Court, however, must note that a grievance was never filed pursuant to

Article XI. Rather, the Union filed a grievance pursuant to Article X of the CBA in order to contest the Company's decision to place plaintiff on unpaid administrative leave.

15. Plaintiff contends that the Union's representation of plaintiff at the arbitration proceeding was "spurious, carried on in bad faith, and deliberately designed to give [p]laintiff the false impression that a sincere effort was being made by the Union to resolve the grievance." (Am.Compl.¶ 18(b).)

motivated by hostility toward plaintiff."
(Am.Compl.¶ 16.)

██ As was previously discussed, plaintiff's conflict of interest claim fails, because the statute of limitations has expired, and because he waived this claim by failing to raise this issue during the arbitration proceedings. As for whether the Union adequately argued plaintiff's case during the arbitration, plaintiff has failed to allege sufficient evidence upon which a reasonable fact finder could find in his favor. In his opposition memo, plaintiff simply states that whether he was fairly represented "during the grievance and arbitration stages is a disputed issue of material fact. Plaintiff's allegation that the Union President had a personal agenda and ulterior motive for sabotaging [p]laintiff's grievance and arbitration rights further accentuates the existence of disputed material facts which make Summary Judgment inappropriate." (Mem. Opp'n Summ. J. at 4.) Mere assertions and allegations which provide the Court with no additional concrete evidence as to the existence of a disputed fact do not enable plaintiff to survive a motion for summary judgment. Plaintiff's counsel in his discussion of Conroy's alleged "ulterior motive" does nothing more than reiterate the assertions made in the amended complaint. In short, such assertions do not permit a reasonable fact finder to find in favor of plaintiff.

Likewise, plaintiff simply, and without corroborating evidence, contends in his opposition memo that Conroy "framed the issues to be arbitrated after discussion with the arbitrator and the opposing Company, but without participation from [p]laintiff; and that for all intents and purposes, the arbitration was conducted in a manner in which ... [plaintiff] was compassed about until dizzy, battered and bruised." (*Id.* at 5.) Plaintiff's assertion that a disputed issue of material fact exists does not create a disputed issue of materi-

al fact. Thus, without providing any concrete evidence to support the contention that the Union misconstrued the issues to be decided during the arbitration, plaintiff cannot survive a motion for summary judgment.

██ Lastly, plaintiff contends that the Union was motivated by hostility. Hostility on the part of the Union, however, does not, by itself, establish a breach of the duty of fair representation. *MacKnight v. Leonard Morse Hosp.*, 828 F.2d 48, 51 (1st Cir.1987). Animosity on the part of the Union is insufficient to establish a breach unless plaintiff shows that the "*handling* of the grievance was itself materially deficient." *Id.* (citations omitted)(emphasis in original). The lynchpin to establishing a breach of the duty of fair representation is the demonstration of a nexus between the alleged wrongdoing and the deficiency in the grievance or arbitration proceedings. *See id.* Plaintiff has clearly failed to illustrate the nexus in this case. In his opposition to the motion for summary judgment, plaintiff simply regurgitates the allegations set forth in the amended complaint. Thus, even if this Court were to accept that the Union was hostile to plaintiff, plaintiff must still illustrate how that hostility resulted in an inadequate grievance process. *Id.* Consequently, this Court holds that no reasonable fact finder could conclude that the Union was motivated by any measurable level of hostility which adversely affected the grievance and arbitration proceedings.

### B. *Breach of the CBA*

Although plaintiff cannot prevail in this hybrid action, because he has failed to establish that the Union breached its duty of fair representation, even if plaintiff had shown that the Union had breached its duty, it is clear to this Court that the Company did not breach the CBA. In his

amended complaint, Plaintiff alleges that the Company violated Article XI, Section 1 of the CBA by assigning plaintiff to the temporary stockroom position without posting the vacancy. (Am.Compl.¶ 9.) Plaintiff also claims that the Company wrongfully placed plaintiff on unpaid administrative leave in violation of Article X, Section 1 of the CBA.[16] (*Id.* ¶ 14.) With regard to the question of the stockroom position/vacancy posting, as was discussed above, the six month statute of limitations has expired, and thus plaintiff's claim is untimely.

The question that remains, therefore, is whether plaintiff was put on administrative leave, with benefits but without pay, in violation of the CBA. The Union filed a grievance contesting the unpaid administrative leave and the matter proceeded to arbitration. The Arbitrator denied plaintiff's grievance on July 9, 2001 concluding that the Company did not violate the CBA. (Award at 8.) Normally, great deference is granted to an arbitrator's decision. *Shaw's Supermarkets, Inc. v. United Food & Comm. Workers Union,* 268 F.Supp.2d 115, 121, 122 (D.R.I.2003). Judicial review of an arbitration award is typically "extremely narrow and exceedingly deferential." *Keebler Co. v. Truck Drivers, Local 170,* 247 F.3d 8, 10 (1st Cir.2001)(internal quotations omitted). When parties contractually commit to resolve disputes by arbitration, those disputes are virtually always won or lost before the arbitrator. *Teamsters Local Union No. 42 v. Supervalu, Inc.,* 212 F.3d 59, 61 (1st Cir.2000). One exception to this otherwise stringent rule involves a plaintiff who brings a hybrid cause of action pursuant to Section

301 of the LMRA. *DelCostello,* 462 U.S. at 164, 103 S.Ct. 2281. The Supreme Court emphasized in *DelCostello* that in the case of a hybrid § 301/fair representation claim, "an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding." *Id.* Hence, the question is whether the undisputed facts indicate that placing plaintiff on unpaid administrative leave was contrary to the CBA. *Id.* at 165, 103 S.Ct. 2281.

As discussed above, plaintiff was scheduled to begin training for the temporary stockroom position on Monday, October 23, 2000. On Friday, October 20, 2000, however, plaintiff's physician, Dr. Bouchard, sent the Company a letter informing it that plaintiff was physically unable to work in a position in which he would be required to engage in activities such as lifting, bending and reaching. The letter informed the Company that plaintiff should remain in his current position as a meter repairman, because changing positions could cause plaintiff unnecessary back problems. The Company, however, became concerned that plaintiff should not perform his job as a meter repairman, because that position required the very same activities proscribed by Dr. Bouchard's letter. To further complicate matters, plaintiff never indicated that he was presently suffering from any injury or illness. (Pl.'s Dep. at 50–53.) Indeed, Dr. Bouchard's letter specifically stated that plaintiff's back problems were stable. (Butler Aff. ¶ 9.)

Clearly the Company faced a serious predicament. If the Company trained plaintiff for the stockroom position or al-

---

**16.** Article X, Section 1 of the CBA entitled "Sick Benefits" reads in pertinent part, "[t]he purpose of the Plan is to provide wage replacement for employees who are genuinely sick or disabled. . . .Before benefit allowance can be paid ... for sickness or disability which extends five (5) or more working days, a Physician's Certificate of Disability shall be submitted to the Company." (Award at 2.)

lowed plaintiff to continue working as a meter repairman, Dr. Bouchard's letter indicated that plaintiff would likely injure his back. On the other hand, plaintiff was not eligible for sick leave under the CBA, because he was not presently suffering from an illness or injury as required by Article X, Section 1 of the CBA. Thus, without a basis on which to suspend or discipline plaintiff, the Company's only option was to place plaintiff on unpaid administrative leave. The Company continued to provide plaintiff with health insurance and other benefits, and indicated that plaintiff could return to work when a position became available that he could safely perform or when he became capable of performing the essential duties of his position with or without reasonable accommodation.

The fact is, plaintiff was placed on administrative leave, because of a doctor's letter which *he* procured under questionable pretenses which *he* created. Plaintiff failed to explain to Dr. Bouchard in full detail the responsibilities of his current position. As a result, Dr. Bouchard was not aware that the stockroom position required virtually the same physical activity as plaintiff's current position in the meter repair department. Thus, although Dr. Bouchard's letter recommended that plaintiff remain in his current position, the letter clearly indicated that plaintiff was physically unable to perform the duties associated with both the stockroom and meter repair positions. Since the Company clearly abided by the physician's letter which outlined plaintiff's physical limitations, this Court holds that no reasonable fact finder could conclude that plaintiff was placed on unpaid administrative leave in violation of the CBA.

*Conclusion*

For the aforementioned reasons, each defendant's motion for summary judgment is granted. As no federal claims remain, plaintiff's second motion to amend the complaint to include the state law claims of intentional infliction of emotional distress and loss of consortium is denied.

Judgment shall enter for defendants forthwith.

It is so ordered.